UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**(ECF)**

GISELE LUNKES, BERANDETT HERCZEG, and ISABELLE A. KRINTZ,

Plaintiffs,

- against -

JOSEPH YANNAI and ELENA FUSILLO,

Defendants.

12 Civ. 0630 (PKC) (JCF)

MEMORANDUM AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Gisele Lunkes, Berandett Herczeg, and Isabelle Krintz allege that the defendants, Joseph Yannai and Elena Fusillo, lured them to the United States with false promises of employment and then enslaved them and that Mr. Yannai sexually abused them repeatedly. After escaping from the defendants' residence, the plaintiffs have brought this action seeking redress under the Trafficking Victims Protection Reauthorization Act (the "TVPRA"), the Fair Labor Standards Act, the New York Labor Law, and New York common law.

After Mr. Yannai was found guilty of human trafficking in a criminal prosecution, Ms. Fusillo, who was not criminally charged, moved to stay all proceedings in this case, and Mr. Yannai joined in that motion. (Affidavit of Joseph Yannai dated May 1, 2012). For the reasons discussed below, the defendants'

motion is granted. For the duration of the stay, they are ordered to preserve and protect all relevant documents and data in their possession.

Background

The plaintiffs allege that between 2003 and 2009, the defendants, who resided together at the same address, "engaged in a scheme to coerce and fraudulently induce young women to travel to the United States from abroad to perform labor and services" (Compl., ¶¶ 7, 8, 22), and that Mr. Yannai "used this scheme to sexually abuse the young women," (Compl., ¶ 22). Specifically, they allege that Mr. Yannai "contacted young women throughout the world, using websites designed to match women seeking work as an au pair with families in need of such workers" (Comp., ¶ 23), and deceived them into illegally entering the United States, where he proceeded to effectively imprison them in his house, sexually abuse them, and demand unpaid domestic services, (Compl., ¶¶ 22-31). Ms. Fusillo's role in the trafficking enterprise allegedly involved helping to select women to be recruited, teaching "house rules" to those who were ensnared, assisting Mr. Yannai in limiting the victims' contact with their families and friends, and acquiescing to Mr. Yannai's threats and use of force to control his victims. (Compl., ¶¶ 24, 40, 55).

All three of the plaintiffs claim to have been recruited to work in the United States in this manner.[1] They allege that Mr. Yannai promised each of them a job providing him assistance with, among other things, preparing meals, cleaning the defendants' shared residence, and accompanying him on business trips. (Compl., ¶ 28). After each plaintiff arrived in the United States, Mr. Yannai met her at the airport and transported her to his residence. (Compl., ¶ 36). Once there, Mr. Yannai forced them to perform "a variety of labor and service tasks . . . including but not limited to cleaning the home, washing dishes, shoveling snow, washing cars, preparing beverages and meals, caring for [Mr. Yannai's] dog, preparing baths for [Mr. Yannai], bringing [Mr. Yannai] cigarettes, and waking [Mr. Yannai] from naps," all without any pay. (Compl., ¶¶ 37, 38). While employed by Mr. Yannai, the plaintiffs were allegedly forced to follow a dress code of skirts, blouses, high heels, and no bras. (Compl., ¶ 50).

During this time, Ms. Lunkes claims that Mr. Yannai repeatedly hit her in the face, threatened to kill her, and on one occasion choked her while threatening to kill her if she

[1] Ms. Lunkes is from Brazil, Ms. Herczeg from Hungary, and Ms. Krintz from France. (Compl., ¶¶ 9-11).

attempted to leave. (Compl., ¶ 46). He allegedly also slapped Ms. Herczeg, implicitly threatened to have the plaintiffs deported if they attempted to leave, and, with the assistance of Ms. Fusillo, closely controlled their contact with friends and families by, among other things, denying them access to transportation to and from the residence. (Compl., ¶¶ 47, 52, 53). Additionally, the plaintiffs claim Mr. Yanna subjected each of them to a range of ongoing sexual abuse. (Compl., ¶¶ 44-80). Ms. Krintz feared Mr. Yannai and alleges that he groped her on at least one occasion. (Compl., ¶¶ 76, 77). Ms. Herczeg describes a pattern of abuse that included, among other things, repeated sexual advances, at least one instance of forced oral sex, and threats that "if she would not perform sexual acts for him, [she] would be treated like 'furniture' . . . and would not be spoken to, would not be allowed to leave the house, would not receive assistance with her health and other needs, and would not be allowed to meet other people . . . ." (Compl., ¶¶ 65-74). Ms. Lunkes claims to have been sexually assaulted hundreds of times over the period from July 2007, when she arrived in the United States, to March 23, 2009, when she escaped from the defendants' residence. (Compl., ¶ 58). According to Ms. Lunkes, these assaults routinely involved oral sex, often included being bitten

by Mr. Yannai, and frequently left bruises and other marks. (Compl., ¶¶ 58-64).

In order to escape the defendants' residence, Mr. Herczeg met online a fellow Hungarian citizen living in Pound Ridge, New York and arranged to meet with her secretly on March 11, 2009. (Compl., ¶ 78). After their meeting, Ms. Herczeg returned to the defendants' residence to pack her belongings. (Compl., ¶ 78). Around midnight that night, police officers arrived at the home, and Ms. Herczeg left with them. (Compl., ¶ 78). On March 23, 2009, police reentered the defendants' residence to rescue Ms. Lunkes and Ms. Krintz. (Compl., ¶ 80).

On July 29, 2010, Mr. Yannai was charged with inducing women to travel to the United States for the purpose of committing sexual abuse, attempted forced labor, forced labor, fraud in labor contracting, importing aliens for immoral purposes, inducing aliens to illegally enter and reside in the United States, and unlawful employment of aliens. On June 3, 2011, a jury found him guilty on all counts. (Compl. ¶ 84; Transcript of Criminal Cause for Jury Verdict, United States v. Yannai, No. 10-CR-59 (E.D.N.Y. June 3, 2011), attached as Exh. B to Declaration of Francis J. O'Reilly dated April 5, 2012, at 1350-61).

Although Ms. Fusillo allegedly participated in the trafficking, she was not criminally charged.

On January 25, 2012, the plaintiffs filed this action. Mr. Yannai moved for a new trial in his criminal case on March 13, 2012, and on April 9, 2012, Ms. Fusillo filed the instant motion for a stay pursuant to 18 U.S.C. § 1595(b), the provision of the TVPRA which provides for staying all civil proceedings under that statute while any related criminal prosecution is pending. The defendants argue that under Section 1595 a stay is mandatory until either the resolution of his post-verdict motions for a new trial, sentencing, or appeal. The plaintiffs contend that: (a) Section 1595 does not require a stay under these circumstances, (b) if a stay is proper, it should not apply to the claims against Ms. Fusillo, and (c) any stay should apply only to their claims under the TVPRA and not their related state law claims. In the event a stay is issued, the plaintiffs seek a protective order requiring the defendants to preserve all relevant documents and information in their possession.

As of July 17, 2012 no decision has been made with regard to Mr. Yannai's motion for a new trial, and he has not yet been sentenced.

## Discussion

### A. Whether Section 1595 Requires a Stay

The TVPRA provides that "[a]n individual who is a victim of [sexual trafficking] may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [sexual trafficking])." 18 U.S.C. § 1595(a). The statute, however, also requires that "[a]ny civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. § 1595(b)(1). For purposes of the TVPRA, a "'criminal action' includes investigation and prosecution and is pending until final adjudication in the trial court." 18 U.S.C. § 1595(b)(2). The precise meaning of "final adjudication" in this context is apparently a question of first impression.

The defendants contend that "[u]ntil the finality of sentencing, or the success of Mr. Yannai's appeal and his motion for a new trial, the federal case remains pending, at the trial court level." (Memorandum of Law in Support of Defendants' Motion for Stay ("Def. Memo.") at 3). They have thus identified three potential landmarks that could constitute "final

adjudication": (1) sentencing, (2) the resolution of any appeals,[2] or (3) the resolution of the defendant's post-verdict motion for a new trial. The plaintiffs, in turn, argue that "final adjudication" should be read to refer to the time of verdict. (Pl. Memo. at 3).

Final disposition logically coincides with the entry of the judgment in a criminal matter, which in turn occurs when a criminal defendant is sentenced. See Fed. R. Crim. P. 32(k)(1) ("In the judgment of conviction, the court must set forth the plea, the jury verdict or the court's findings, the adjudication, and the sentence."); Rodriguez v. United States Department of Homeland Security, 629 F.3d 1223, 1226-27 (11th Cir. 2011) ("[T]o establish a conviction for immigration purposes, a court must accept a guilty plea or jury verdict, make an adjudication, and impose a sentence."); Puello v. Bureau of Citizenship and Immigration Services, 511 F.3d 324, 328-31 (2d Cir. 2007)

[2] The defendants now concede that a stay pursuant to Section 1595(b) does not extend through the appellate process. (Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Stay ("Def. Reply.") at 1-2 ("[Section 1595] is completely unambiguous: The action is stayed until a final adjudication at the trial court level. There is no stay during the appeal process.")).

(holding that, in context of immigration, statutory definition of "formal judgment of guilt" occurs at time of sentencing).

Furthermore, interpreting "final adjudication" to refer to sentencing and entry of judgment is consistent with the purpose and legislative history of Section 1595. The Department of Justice initially opposed the TVPRA's private right of action on the grounds that it would "hinder prosecutors' abilities to try a case unfettered by the complications of civil discovery," and that "prosecutions should take priority over civil redress and . . . should be complete prior to going forward with civil suits." H.R. Rep. No. 108-264, pt. 2, at 17 (2003). The inclusion of the mandatory stay provision was meant to allay that concern, and reading "final adjudication" to refer to sentencing does so because once a defendant has been sentenced, civil litigation no longer poses a risk of adversely affecting the government's ability to prosecute the case. Treating the issuance of a verdict as final adjudication does not address the Department of Justice's concern as fully, as the possibility remains that the judge may order a new trial which could be disrupted by a concurrent civil suit.

When determining whether a criminal guilty plea constitutes a final adjudication in other contexts, some courts have held

that guilty pleas are equivalent to convictions by trial and are therefore not distinct from a final adjudication on the merits. See Herley Industries, Inc. v. Federal Insurance Companies, Inc., No. 08-5377, 2009 WL 2596072, at *10 (E.D. Penn. Aug. 21, 2009); First National Bank Holding Co. v. Fidelity & Deposit Co., 885 F. Supp. 1533, 1537 (N.D. Fla. 1995) (holding argument that guilty plea was not final adjudication to be frivolous). This was because a plea "constitutes an admission to all facts alleged in the indictment." Herley, 2009 WL 2596072, at *10 (internal quotation marks and citation omitted). While that is true, it is not a rationale relevant to the underlying purpose of Section 1595's stay provision, which is to protect the ability of the government to criminally prosecute traffickers. Moreoever, the Herley case involved the interpretation of Pennsylvania law, not the TVPRA or any other federal statute, and was decided after Mr. Herley had already been sentenced. Id. Indeed, the Herley court noted that, in the alternative, "Herley's sentencing . . . could be considered the final adjudication in Herley's criminal action." Herley 2009 WL 2596072, at *10.

B. Scope of the Stay

The TVPRA requires that "[a]ny civil action filed under [Section 1595] shall be stayed during the pendency of any

criminal action arising out of the same occurrence in which the claimant is the victim." 18 U.S.C. § 1595(b)(1). The plaintiffs argue that because Ms. Fusillo was never criminally charged, Section 1595 only stays the proceedings against Mr. Yannai. Second, they argue that only three of their thirteen total claims against Mr. Yannai are subject to the stay -- specifically, the three brought pursuant to the TVPRA and not the related federal and state minimum wage claims.

Whether a stay under Section 1595 applies against all defendants in a TVPRA case or only against those who are themselves criminal defendants does not appear to have been addressed by any court. In light of the statute's goal of protecting the government's ability to prosecute traffickers criminally, it is most appropriate for a Section 1595 stay to encompass all defendants in a case. Discovery with respect to those civil defendants not facing criminal charges, like Ms. Fusillo in this case, will frequently overlap significantly with the discovery relating to criminally charged defendants. Thus, the risk of interference with criminal prosecution is fully addressed only be extending the stay to all defendants. Moreover, this interpretation comports with the ordinary meaning of Section 1595's command that "[a]ny civil action" brought under

the TVPRA be stayed during the pendency of "any criminal action arising out of the same occurrence of which the claimant is the victim." 18 U.S.C. § 1595(b)(1).

Similarly, the plaintiffs are mistaken when they argue that Section 1595 "only stays the three claims that [they] brought under the TVPRA, and not their ten additional claims." (Pl. Memo. at 2). First, Section 1595 requires the stay of "[a]ny civil action" to which it is applicable; it does not speak of staying particular claims. 18 U.S.C. § 1595(b)(1). Second, staying only the plaintiffs' TVPRA claims would not avoid the risk of civil litigation interfering with the government's ability to prosecute its case because, as with additional defendants, discovery with respect to a plaintiff's non-TVPRA claims will commonly overlap with the TVPRA-specific discovery. Finally, other courts that have stayed cases involving TVRPA claims have consistently taken the view that the stay applies to the whole case rather than to the plaintiff's TVPRA claims alone. See, e.g., Ara v. Khan, No. 07 CV 1251, 2007 WL 1726456, at *1-2 (E.D.N.Y. June 14, 2007) (staying "all proceedings" pursuant to government's request under Section 1595(b)(1) in case invoking TVPRA and "a number of legal authorities"); Antonio-Morales v. Bimbo's Best Produce, Inc., No. 8:5105, 2009 WL 1591172, at *1-2

(E.D. La. April 20, 2009) (tolling statute of limitations for potential opt-in plaintiffs while plaintiffs' Fair Labor Standards Act claims stayed pursuant to Section 1595(b)(1) along with plaintiffs' TVPRA claims).

C. Protective Order

The plaintiffs seek a protective order on the ground that, without such an order, the defendants could readily alter or destroy relevant evidence during the course of the stay required by Section 1595. In response, the defendants argue that the proposed protective order "is too vague with which to comply" (Def. Reply at 6), but they provide no explanation of why they believe that to be so.

When an action is stayed, a court may order the parties to preserve vulnerable evidence until the proceedings resume. See, e.g., Antonio-Morales, 2009 WL 1591172, at *2 (ordering defendants "to preserve and protect" all relevant "documents, data compilations (including electronically recorded or stored data), and tangible objects" in their custody or control during the pendency of Section 1595 stay case alleging violations of Fair Labor Standards Act and TVPRA). Here, because of the nature of the defendants' alleged fraudulent scheme, a substantial portion of the relevant evidence is likely to consist of e-mails,

documents, or photographs currently in the defendants' possession. Because the defendants could easily alter or destroy such evidence, the plaintiffs' motion for a protective order is granted.

Accordingly, during the pendency of the stay, the defendants shall preserve and protect all relevant documents, data compilations (including electronically recorded or stored data), and tangible objects in their custody or control, including the custody or control of their subagents. In this context, "relevant" refers to relevance for purposes of discovery, which is "an extremely broad concept." Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); Convolve, Inc. v. Compaq Computer Corp., 223 F.R.D. 162, 167 (S.D.N.Y. 2004); Melendez v. Greiner, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003). Notably, "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Conclusion

For the reasons stated above, the defendants' motion for a stay pursuant to 18 U.S.C. § 1595(b)(1) (Docket no. 11) is granted.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
July 17, 2012

Copies mailed this date:

Mitchell Alan Karlan, Esq.
Jana Checa Chong, Esq.
Sharon Israel Grysman, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 48th Floor
New York, NY 10166

Francis J. O'Reilly, Esq.
10 McMahon Place
Mahopac, NY 10541

Joseph Yannai
# 78396-053
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232